# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 44
The People &c.,
      Respondent,
   v.
Marc Mitchell,
      Appellant.

Ying-Ying Ma, for appellant.
Philip V. Tisne, for respondent.

GARCIA, J.:

Defendant waived prosecution by information, pleaded guilty to fraudulent accosting (Penal Law § 165.30 [1]), and was sentenced to time served. He argues on appeal that the term "accost" should be narrowly construed to require "a physical approach and an

- 1 -

element of aggressiveness or persistence" that is "directed toward a specific individual, rather than the public at large."  We reject that proposed definition, hold that the complaint was facially sufficient, and affirm.

Because defendant waived prosecution by information, we judge facial sufficiency by the standard applied to a misdemeanor complaint (*see* CPL 170.65 [3]; *People v Kalin*, 12 NY3d 225, 228 [2009]), namely that the accusatory instrument "need only set forth facts that establish reasonable cause to believe that the defendant committed the charged offense" (*People v Dumay*, 23 NY3d 518, 522 [2014]; *see* CPL 100.40 [4] [b]). "Reasonable cause" exists when "evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such person committed it" (CPL 70.10 [2]).  The complaint in this case met that standard.

A person is guilty of fraudulent accosting when he or she "accosts a person in a public space with intent to defraud him of money or other property by means of a trick, swindle or confidence game" (Penal Law § 165.30 [1]).  In pertinent part, the complaint alleged that defendant was standing on a Manhattan street corner next to two milk crates set up as a table.  On the table was a black box with a slot for money and fliers describing how to donate to homeless shelters.  According to the complaint, defendant positioned the table in a way that "blocked" the sidewalk, causing at least 75 pedestrians to have to "walk around" him in order "to continue walking on the sidewalk."  As pedestrians did so, defendant asked them to "'[h]elp the [h]omeless.'"  In response to a question by a police

officer, defendant said that "'donations go to a Church on 116 Street,'" but he "was unable to state the name of the church or the name of the person that receives the money." Although defendant told the officer that he was "'the [p]resident of the NYC Homeless Outreach'" and gave the officer "a laminated card which stated he was affiliated with" that organization, he later admitted that "'[m]ost of the proceeds'" went to him.

On appeal following his plea, defendant claimed that the accusatory instrument was facially insufficient as to the fraudulent accosting charge. The Appellate Term affirmed, holding that the "accosting" element was "satisfied by allegations that defendant 'ask[ed] passing pedestrians to '[h]elp the [h]omeless,'" citing language from a criminal court case to the effect that this element "'requires that . . . defendant take some affirmative action to make contact with the victim for the purpose of involving the individual in the scam'" (69 Misc 3d 133[A], 2020 NY Slip Op 51240[U], *1 [App Term, 1st Dept 2020], citing *People v Morrison*, 58 Misc 3d 19, 20 [App Term, 1st Dept 2017], quoting *People v Tanner*, 153 Misc 2d 742, 746 [Crim Ct, New York County 1992]). A Judge of this Court granted defendant leave to appeal (36 NY3d 1052 [2021]).

In interpreting a statute, we look to effectuate the intent of the legislature (*see Patrolmen's Benevolent Assn. of City of N.Y. v City of New York*, 41 NY2d 205, 208 [1976]). "[T]he clearest indicator of legislative intent is the statutory text," and we therefore start with the plain meaning of the language itself (*see Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]). Applying that well-settled standard leads us to reject defendant's argument that "accost" as used in the statute requires "a physical approach and an element of aggressiveness or persistence."

"Accost" is not defined in the Penal Law, and, accordingly, to discern its meaning here, we look to dictionaries from the time of the statute's enactment as well as the statute's purpose and history (*see Yaniveth R. v LTD Realty Co.*, 27 NY3d 186, 192 [2016]; *People v Ocasio*, 28 NY3d 178, 181-184 [2016]; McKinney's Cons Laws of NY, Book 1, Statutes §§ 232; 234). During the relevant period in 1952, when the legislature created the offense of fraudulent accosting (*see* L 1952, ch 640), contemporary dictionaries defined "accost" to mean either to "approach," to "speak to first," or to "address" (*see e.g.* Webster's New World Dictionary of the American Language [1951] ["to approach and speak to; speak to first before being spoken to"]; Webster's New Collegiate Dictionary [1949] ["(t)o approach" or "(t)o speak first to; to greet"]). Indeed, a California appellate court looking for the meaning of "accost" in a 1961 statute noted that the definition "'to approach, to speak to, to address'" was found in "10 of 12 dictionaries" cited by the lower court and "in all 6 of those dictionaries that were in print at the time the statute was enacted" (*Ulmer v Municipal Ct.*, 55 Cal App 3d 263, 266 [Ct App 1976]). No dictionary cited from the relevant time period limits the term to an aggressive or persistent physical approach.[1] All the dictionaries cited by defendant in support of his proposed definition were published decades after the statute's enactment and, therefore, are inapt.

---

[1] One Webster dictionary later added, as the second definition of "accost," "to confront, usu[ally] in a somewhat challenging or defensive way" (Webster's Third New International Dictionary [1961]; *but see* Webster's Seventh New College Dictionary [1967] [listing the only definition of "accost" as "to approach and speak to; speak first to; address"]).

Defendant's definition of "accost" as including only persistent or aggressive conduct is also inconsistent with the Bartlett Commission's[2] understanding of the term. In 1964, the Commission made a proposal—later withdrawn—to place the offense within a new "harassment" section of the Penal Law, so that it would apply only when the perpetrator acted with the intent "to harass, annoy or alarm another person" (Bartlett Commission, Staff Notes on Proposed Penal Law § 250.10, at 387-390 [1964]). It is inconceivable that the Commission would require such intent as a separate element if "common usage" (dissenting op at 8-9) defined "accost" to mean essentially the same thing (*see* McKinney's Cons Laws of NY, Book 1, Statutes § 231).

As to the purpose in enacting the fraudulent accosting statute, the goal was to protect the public against "the swindler who proposes by his acts to defraud innocent victims of property" (Mem of the Citizens Union of the City of NY, Bill Jacket, L 1952, ch 640, at 12) and to "aid police in stamping out an ever-increasing number of swindle rackets," of which there are "many variations" (Mem of the City of NY, Bill Jacket, L 1952, ch 640, at 7). Many of those swindles involved an initial approach that was benign. For example, the "handkerchief switch" begins with the perpetrator "inform[ing]" the victim that he has "occult powers" that enable him to increase the denomination of dollar bills (Mem of the City of NY, Bill Jacket, L 1952, ch 640, at 8-9). In the "pocket-book drop" scam, the perpetrator tells the victim that he "just found a substantial sum of money in a pocket-

---

[2] The Bartlett Commission was tasked with studying and recommending a revised version of the Penal Law (*see* Interim Rep of Temp St Commn on Rev of Penal Law and Crim Code, 1962 NY Legis Doc No. 41 at 5).

book" and does not know what to do with it (*id.* at 7).  A narrow interpretation of the fraudulent accosting statute, requiring an aggressive or persistent physical approach, would make it impossible for the statute to reach such conduct and would run contrary to the statute's intended purpose (*see* McKinney's Cons Laws of NY, Book 1, Statutes § 234, Comment).

This point is brought home by the 1965 amendment of the statute (*see* L 1965, ch 1030), a "noteworthy feature" of which was the inclusion of language to allow for the perpetrator to manifest the requisite culpable intent either "at the time and place of the original 'accosting' 'or subsequently in any place'" (Richard G. Denzer & Peter McQuillan, Practice Commentary to Penal Law § 165.30, McKinney's Cons Laws of NY, Book 39, at 515).  This language "embraces" the fact that a swindler may engage in an "initial approach" that is "ostensibly innocent from a conversational standpoint"—rather than "aggressive or persistent"—and, later, manifest the requisite intent to defraud "at another time and place" (*id.*).

Lower courts have uniformly applied an interpretation of "accost" that does not require any aggressive or persistent approach.  Instead, to establish the offense's "accost" element, courts have required only that the defendant initiate contact with a potential victim through an affirmative act (*see e.g. People v Bannister*, 37 Misc 3d 1229[A], 2012 NY Slip Op 52240[U], *2-3 [Crim Ct, NY County 2012]; *People v Mellish*, 4 Misc 3d 1013[A], 2004 NY Slip Op 50869[U], *4 [Crim Ct, NY County 2004]).  Indeed, "stationing" (dissenting op at 16-17), with no accompanying affirmative action to make contact with a potential victim, is insufficient, as evidenced by the legislature's decision to remove that

term from the statute (*see* L 1965, ch 1030; *see also Tanner*, 153 Misc 2d at 745 ["Though defendant may have hoped that people would walk over to the table where he was seated, this essentially passive behavior was not 'accosting'"]).

Here, the accusatory instrument contained factual allegations sufficient to establish reasonable cause that defendant accosted the potential victims of his scam. The complaint alleged that defendant set up a makeshift table that "blocked" the sidewalk, requiring pedestrians "to walk around [him] to continue walking on the sidewalk," and asked the passersby to "'[h]elp the [h]omeless.'" In other words, not only did the complaint establish that defendant spoke first to the pedestrians by calling out to them, but also that defendant engaged in an affirmative act tantamount to a physical approach, by blocking the sidewalk and forcing passersby to maneuver around him to proceed.[3]

Defendant, citing the statutory language requiring that the offender accost "a person in a public place" (Penal Law § 165.30 [1]), also argues that the approach must be directed toward a specific individual, rather than the public at large. It is a settled rule of statutory interpretation that "[w]ords in the singular number include the plural" (General Construction Law § 35; *see also* Antonin Scalia & Bryan A. Gardner, Reading Law: The Interpretation of Legal Texts 129-131 [2011]). This rule "is applicable to every statute unless its general object, or the context of the language construed, or other provisions of law indicate that a different meaning or application was intended" (General Construction Law § 110). There is no reason to apply that exception here, given that the statute was

---

[3] Accordingly, we leave for another day the question of whether a defendant "accosts" someone within the meaning of the statute solely by calling out to potential victims.

aimed at preventing members of the public, going about their business in public places, from being lured into fraudulent schemes (*see CIT Bank N.A. v Schiffman*, 36 NY3d 550, 559 [2021] ["words in the singular may generally be interpreted to encompass the plural, if doing so is consistent with the context and legislative intent"]; *see e.g. Johnson v Joy*, 48 NY2d 689, 691 [1979] [interpreting a statutory term in the singular form to include the plural where such interpretation, "in context and in light of the purpose" of the statute, was "clearly reasonable"]).

A quick word about the dissent's proposal to define "accost" to mean the following: to physically approach a specific member of the public in a persistent, aggressive, or otherwise particularly assertive manner that can also "take the form of the perpetrator insinuating themselves into the victim's physical space" (dissenting op at 12). No relevant dictionary provides support for such a limiting interpretation. Nor has any court considering the issue applied anything remotely near that restrictive of a definition. As discussed above, adoption of the dissent's approach would effectively make it impossible to prosecute the very schemes that the legislature sought to proscribe by enacting the provision (*see* dissenting op at 11-12 n 7). And, contrary to the dissent's dramatic warning that we come "perilously close to criminalizing" protected speech (dissenting op at 2), "[w]here false claims are made to effect a fraud or secure money or other valuable considerations, . . . it is well established the [g]overnment may restrict speech without affronting the First Amendment" (*United States v Alvarez*, 567 US 709, 723 [2012] [plurality]). Addressing that potential constitutional infirmity was, of course, the purpose of the 1971 amendment adding the fraudulent intent element to the statute (*see* L 1971, ch

772; *People v Harris*, 64 Misc 2d 510, 515 [App Term 1st Dept 1969] [refusing to save the statute by reading into it "that acts be committed . . . *or* that there must be a coexistent fraudulent intent" (emphasis added)]). Lastly, dismissing the charges against a defendant who admitted that he falsely led members of the public to believe that they were donating to a legitimate charity that helps the homeless seems much more likely to undermine—rather than advance—the laudable goals of such organizations (*see* dissenting op at 15-16).

Defendant's remaining contentions have been considered and are without merit.

Accordingly, the order of the Appellate Term should be affirmed.

RIVERA, J. (dissenting):

What does it mean to "accost a person" as target of a swindle for purposes of Penal Law § 165.30 (1), the fraudulent accosting statute? The majority has no clear answer but concludes that the term encompasses defendant's act of standing on a public street corner,

- 1 -

calling out to no one in particular to "help the homeless" as pedestrians walked around him. That conclusion relies on an overly broad view of the phrase "accost a person" that is contrary to its commonly understood meaning of an affirmative, aggressive act, contact with a specific target, or a directed invitation to engage another. The legislature amended the statute to its current form in order to increase penalties on confidence artists—those who prey on victims by use of trickery and deceit, in an effort to gain the victim's trust. The statute does not criminalize calling out to the general public simply because, as the majority concludes, the speaker happens to stand in someone's preferred route through a crowded pedestrian sidewalk. The majority's approach is perilously close to criminalizing speech protected by the First Amendment.[1] I dissent.

I.

Defendant Marc Mitchell was arrested on a New York City street corner near Times Square, in the heart of Midtown Manhattan. It was around 7:15 p.m. on February 16, 2016, a busy night in the neighborhood, as the Theater District opened its doors for the evening's performances.

A misdemeanor complaint charged defendant with the class A misdemeanor of fraudulent accosting (Penal Law § 165.30 [1]) and disorderly conduct (Penal Law § 240.20

---

[1] The majority's contentions—that false claims in furtherance of a fraud are not protected speech and that the intent element of the statute obviates First Amendment concerns (*see* majority op at 8-9)—elide that this is a jurisdictional challenge based on the sufficiency of the factual allegations in the accusatory instrument. A challenge to the statute under the overbreadth doctrine would not be limited to the particular facts of defendant's alleged conduct (*see People v Marquan M.*, 24 NY3d 1, 8 [2014], quoting *United States v Stevens*, 559 US 460, 473 [2010], and *People v Stuart*, 100 NY2d 412, 421 [2003]).

[5]), a violation. As relevant to this appeal, Penal Law § 165.30 (1) provides that "[a] person is guilty of fraudulent accosting when [they] accost[] a person in a public place with intent to defraud [that person] of money or other property by means of a trick, swindle or confidence game."

According to the complaint, an officer observed defendant "standing [on the corner of Broadway and West 48th street] . . . next to two milk crates that were set up like a table while asking passing pedestrians to 'Help the Homeless.'" On the table was a black box with statistics about shelters in New York City and a paper explaining where donations would be directed and payment options. The officer alleged that defendant, upon questioning, stated "[t]he donations go to a church on [116th] Street," although he could not name the church or who receives the money,[2] and that defendant was "President of the NYC Homeless Outreach." The officer further alleged that defendant presented him with a laminated card stating his affiliation with "NYC Homeless Outreach" and that the date

[2] In 2016, when defendant was arrested, there were no less than eight churches in Manhattan on 116th Street or an intersecting avenue, including Our Lady of Mount Carmel (*see* http://www.mountcarmelshrine.com/), the Canaan Baptist Church of Christ (*see Our History*, https://www.canaanbaptistcoc.com/our-history), the Salvation & Deliverance Headquarters Church (*see Origin of the Ministry*, https://www.sndhq.org/mission), the First Corinthian Baptist Church (*see Our Story*, https://fcbcnyc.org/about/our-story), the Second Providence Baptist Church (*see* Edgar Sandoval and Victoria Bekiempis, *Historic Harlem Church Wants Judge to Allow Sale of Building for $6M to Condo Developer*, NY Daily News [Jan 9, 2017], https://www.nydailynews.com/new-york/manhattan/harlem-church-judge-6m-sale-building-article-1.2941974), the Mount Zion A.M.E. Church (*see Mount Zion A.M.E. Church Celebrating 100 Years*, https://mountzionamenyc.org/our-history-honoring), the Primera Iglesia Bautista de Habla Española de Nueva York (*De 1938 a 1961*, http://pibheny.nyc/de-1938-a-1961/), and the First Sharon Baptist Church (*see* David W. Dunlap, From Abyssinian to Zion: A Guide to Manhattan's Houses of Worship 78-79 [2004]).

of birth on that card did not, in some unstated way, match the date of birth on the benefits card defendant also presented to the officer. Defendant also stated that "most of the proceeds actually go to [him] because [he] is homeless." The officer did not allege any facts contradicting defendant's statements that the organization existed, that defendant was affiliated with it, that donations went to a church on 116th Street, or that defendant was in fact homeless. The officer did observe and allege that the milk crate set up blocked approximately 75 pedestrians who "had to walk around the defendant to continue walking on the sidewalk." However, the officer did not allege that he observed a single pedestrian stop and interact with defendant, or that defendant made contact or otherwise approached or insinuated himself into the physical space of any person as they walked by.[3]

After being held a night in jail, defendant appeared for arraignment where the prosecution sought 90 days' incarceration on the charges. The court instead offered defendant time served and expressed the court's doubts as to the fraudulent accosting charge as described in the complaint:

> "On these facts—look, I would understand if there were some threatening behavior done to another individual to get an individual to give money. I understand it is a crime, but there is nothing here. It says the only one that even went up to [defendant] was the officer and said to him, well, let me see your benefit card. He showed his benefit card. The officer said, well, it doesn't match something you're presenting to me. Why are you saying it goes to the homeless? And he says, because I am homeless.
>
> "Look, you can't do this."

---

[3] The misdemeanor complaint also states that defendant "obstructed vehicular . . . traffic" but provided no factual support for that allegation.

After defendant pleaded guilty to the fraudulent accosting charge in satisfaction of the complaint, and before the court imposed sentence, the court again expressed its uncertainty that defendant had broken the law:

> "I want to note, before I sentence you . . . that, I know the People's position was they were trying to protect tourists, but there is nothing in this complaint that even says [defendant] went up to a tourist, and just used the word accosting. It says he asked pedestrians. I don't know if that rises to the level of accosting."

The Appellate Term affirmed the conviction, rejecting defendant's claim that the accusatory instrument was jurisdictionally defective because it lacked sufficient facts to establish reasonable cause to believe he accosted or intended to defraud anyone (*see* 69 Misc 3d 133[A], 2020 NY Slip Op 51240[U] [App Term, 1st Dept 2020]). As to that challenge, the court concluded that the instrument sufficiently alleged an affirmative act constituting "[t]he accosting element of the offense . . . by allegations that defendant 'ask[ed] passing pedestrians to 'Help the Homeless'" (*id.* at *1).

I would reverse because the accusatory instrument is jurisdictionally defective, as it lacks any factual assertions that defendant accosted someone.[4] The Appellate Term is correct that the statute requires an affirmative act, but mere passive speech without some physical contact or aggressive (in the sense of intrusive) behavior to engage a potential

---

[4] Unlike the majority, which rejects without explanation defendant's alternative claim that the accusatory instrument fails to plead an intent to defraud another person (*see* majority op at 9), I have no occasion to opine on whether the instrument sufficiently alleges the requisite mens rea because, as I explain, the instrument is jurisdictionally defective for failing to set out facts constituting the actus reus.

victim is legally insufficient to establish reasonable cause to believe that defendant fraudulently accosted some unknown person. Defendant did not "accost" a particular individual—indeed he did not make any attempt to target anyone—by calling out to the general public to act charitably; the fact that passersby sought to avoid contact with defendant by walking around him does not transform his speech into the required criminal actus reus.

## II.

The majority correctly explains the standard and rules of construction we must apply on this appeal, and I have no quarrel with the articulation of these well-established legal principles. Rather, I take issue only with the majority's application of the law to reach its ultimate conclusion that the accusatory instrument is facially sufficient. Although we usually begin with the statutory language, the Penal Law does not define "accost," and so we cannot rely in the first instance solely on the plain text to resolve defendant's jurisdictional challenge. Instead, we must fathom the legislative intent and determine the coverage of the statute by employing extrinsic aids to statutory construction.

As the Court has previously explained, "[i]n the absence of a statutory definition, 'dictionary definitions serve as useful guideposts in determining the word's ordinary and commonly understood meaning. This follows from the principle that, generally, unless a contrary intent is clear, lawmakers employ words as they are commonly or ordinarily employed'" (*People v Holz*, 35 NY3d 55, 59 [2020], quoting *People v Aleynikov*, 31 NY3d 383, 397 [2018]; *see also* McKinney's Cons Laws of NY, Book 1, Statutes §§ 232, 234).

The majority and I consider the same guideposts but reach the opposite conclusion as to what definition those sources suggest applies here.

At the time the statute was enacted and later amended to its present version, accost was defined in multiple ways, all of which required initial affirmative, targeted conduct, but not necessarily physical contact. Dictionaries of the period included the broad definitions relied upon by the majority—to "approach," "speak to first," or "address" (*see e.g.* The American Heritage Dictionary of the English Language 9 [1969]; Webster's Seventh New Collegiate Dictionary 6 [Merriam-Webster 1963]; 1 Webster's New World Dictionary of the American Language 9 [1951]; Webster's Sixth New Collegiate Dictionary 6 [Merriam-Webster 1949]). But along with these definitions, accost was also defined narrowly and discriminately as the following aggressive or offensive behavior towards another person: "to confront, usu. in a somewhat challenging or defensive way"; "to address abruptly (as in a chance meeting) and usu. with a certain degree of impetuosity or boldness" (Webster's Third New International Dictionary 12 [Merriam-Webster 1961]). Moreover, at least one thesaurus from this period listed synonyms for accost based on aggressive conduct (*see* Webster's First Dictionary of Synonyms 13 [Merriam-Webster 1951] [affront, offend, and insult]). Thus, "accost" is a particularly assertive, often unexpected manner of "approach[ing]," "speak[ing] first to," or "addressing" another.[5]

---

[5] As is clear from the definitions in the above paragraph, the majority is incorrect that "[n]o relevant dictionary provides support" for my definition of accosting (majority op at 8). Moreover, as I discuss (*see* section III, *infra*), my definition is supported by the legislative history evincing a focus on confidence games and by lower court case law.

Although the majority relegates the narrow definition to a footnote (*see* majority op at 4 n 1), that definition has historic and contemporary resonance. Indeed, the definition of accost as aggressive or offensive behavior that directly targets another comports with the common usage of the term, then and now (*see e.g.* 166 Cong Rec H3703 [July 23, 2020] [Representative Alexandria Ocasio-Cortez] ["I want to thank him (i.e., Representative Ted Yoho) for showing the world that you can be a powerful man and accost women"]; Senator John F. Kennedy, The Religion Issue in American Politics, Remarks at the American Society of Newspaper Editors [Apr. 21, 1960] ["I think they (i.e., voters) objected to being accosted by reporters outside of political meetings and asked one question only—their religion—not their occupation or education or philosophy or income—only their religion"], available at https://www.jfklibrary.org/archives/other-resources/john-f-kennedy-speeches/american-society-of-newspaper-editors-19600421 [last visited May 4, 2022]; *see generally Yaniveth R. v LTD Realty Co.*, 27 NY3d 186, 192 n 2 [2016] [explaining that dictionary definitions "are a useful tool of statutory construction to the extent that they reflect the common meaning and usage of (a) term" at the time of enactment]). That common understanding survives and is reflected in dictionary editions from the time of defendant's arrest (*see e.g.* Merriam-Webster Online Dictionary [https://web.archive.org/web/20160201154355/https://merriam-webster.com/dictionary/accost] [archived Feb. 1, 2016] ["to approach and speak to often in a challenging or aggressive way"]; The American Heritage Dictionary of the English Language [https://web.archive.org/web/2016/0408041836/https://www.ahdictionary.com/word/sear

ch.html?q=accost] [archived Apr. 8, 2016] ["(t)o approach and speak to, especially aggressively or insistently, as with a demand or request"]; Oxford English Dictionary [https://www.oed.com/view/Entry/1184] ["(t)o approach and speak to, esp. (in later use) in a bold, hostile, or unwelcome manner; to waylay (a person) in this way"]). Present day thesauruses, as did their predecessors, reflect this same understanding of accost as a manifestation of aggressive behavior towards another (*see e.g.* Merriam-Webster Online Thesaurus [https://www.merriam-webster.com/thesaurus/accost] [e.g., affront, challenge, and corner]). As these sources make clear, "accost" as a descriptor of benign, general behavior—to merely approach, speak first to, or address another—is an overgeneralization that fails to express the nuance of conduct encompassed by the narrower, more particularized definition that focuses on the actor's conduct towards a target.

There is no logical reason to rely, as the majority does, on the definition that was out of step with common usage at the time of the enactment and amendment of the statute, at the time of defendant's arrest, and which continues to be today.[6] Nor is there reason to assume that the legislature intended the broader meaning, notwithstanding the formally recognized and popular use of the other, narrower definition.

In any case, the majority misapplies the broad definition of accost that requires that a person "approach," "speak first to," or "address," because the accusatory instrument here

---

[6] Because a definition with an element of aggression or assertion has consistently been recognized in print and common usage, there is no reason to consider defendant's argument that dictionaries in print prior to defendant's arrest are not relevant because we may only look to sources available at the time of defendant's alleged criminal act.

lacks sufficient factual support for reasonable cause to believe that defendant accosted within the meaning of the statute. Nowhere does the officer allege that he observed defendant approach anyone, and the majority does not contend otherwise. Nor did defendant speak first to or address a particular individual in order to engage a potential victim in the alleged scam. In fact, the officer did not observe a single person respond positively to defendant's invitation to help the homeless. But the fraudulent accosting statute only applies if defendant "accosts a person in a public place with intent to defraud [that person]." Simply stated, the statute requires conduct focused on a victim, and the accusatory instrument lacks any factual assertion of defendant's contact with anyone. Indeed, as the trial court explained, "there is nothing here" because the accusatory instrument did not allege that defendant interacted with another person. If defendant's calling out to the general public falls within these definitions—and the majority specifically does not base its conclusion solely on defendant's statement into the air—then to accost would be nothing more than a form of common speech, and the term would be rendered meaningless in application. It is the speaker's targeting of a particular listener that distinguishes these definitions and constitutes the transitive verb—"to accost." And, as I explain (*see* section III, *infra*), this meaning better comports with the actions of the swindlers and confidence artists that are the targets of the statute.

## III.

As with its selective reference to historic dictionary entries, the majority's reliance on the legislative history is misplaced; that history supports the conclusion that the

legislature drafted and adopted the statute cognizant of the dictionary definitions and common understanding that accost requires an affirmative, aggressive, or offensive contact aimed at a target. There is no dispute that the statute is intended to address a category of theft, namely scams employed by confidence artists who prey on human weakness (*see* William C. Donnino, Practice Commentary, McKinney's Cons Laws of NY, Penal Law § 165.30 ["'Fraudulent accosting' is essentially a theft offense aimed primarily at confidence artists who prey upon the gullible"]; Mem of Legis Rep of City of New York at 3, Bill Jacket, L 1952, ch 640). In 1952, the legislature recognized that street swindles were difficult to prosecute, and the statute was passed to assist law enforcement. As New York City's memorandum in support of the legislation discussed, the statute would address common confidence games or "swindle rackets," including "'pocket-book drops'[] [and] 'handkerchief switches'" (Mem of Legis Rep of City of New York at 1, Bill Jacket, L 1952, ch 640).[7] These scams succeed by engaging the victim to gain their trust and confidence—

---

[7] The memorandum first described the "pocket-book drop" as a swindle "ordinarily involv[ing] three participants, two swindlers working together and a victim" (Mem of Legis Rep of City of New York at 1, Bill Jacket, L 1952, ch 640). "Swindler No. 1, usually a woman, posts herself in the vicinity of a bank and waits for an aged, apparently gullible person to emerge" (*id.*). Then, she "approaches the victim with the story that she has just found a substantial sum of money in a pocket-book and that she does not know what to do with it" (*id.*). She shows the money to the victim, and then "swindler No. 2 approaches and swindler No. 1 suggests that they ask No. 2 what to do about the money and whether the matter should be reported to the police" (*id.*). Swindler No. 1 then relays the fake story to swindler No. 2, "who states that while he himself has no constructive suggestions to make, he will request the advice of the president of the corporation of which he himself is an officer," pointing out a "well-established business firm" in the area and then walking towards it (*id.*). "After an appropriate interval, swindler No. 2 reappears" and tells swindler No. 1 and the victim that the president has suggested that the president hold the money while they "search for the owner," with the caveat that the president will only do so if both

hence the label "confidence game" (*see People v Williams*, 93 Misc 2d 726, 733 [Crim Ct, NY County 1978] ["The essence of the classic confidence game is that the victim views the confidence (artist) as a protagonist, someone on (their) side"]). The actions of these perpetrators aligned completely with the definition of accost as affirmative contact, notable for aggressive behavior targeting a potential victim. That aggressive behavior is not always hostile but can take the form of the perpetrator insinuating themselves into the victim's physical space, preying on the victim's desire to acquire a significant sum of money with little effort or to assist a stranger.

Moreover, the majority's characterization of the Bartlett Commission's recommendations is mistaken. The Bartlett Commission initially proposed including fraudulent accosting under the heading of harassment offenses in order to make it easier to

---

the finder (swindler No. 1) and the victim put up "cash security" (*id.* at 2). "Swindler No. 1 pretends to object at first, then puts up a small sum and induces the victim to withdraw a substantial sum from the bank near which the swindle is being perpetrated. Often this represents the victim's entire life savings" (*id.*). Thereafter, swindler No. 2 takes the cash, ostensibly to return to the office and obtain a receipt, after which swindler No. 1 creates an excuse to leave and look for swindler No. 2 (*see id.*).

The handkerchief switch was a confidence scheme in which "[a] swindler . . . poses as a possessor of occult powers and informs the victim" that the con artist can "increase the denomination of money in bill form" (*id.*). Thereafter, the swindler takes "one of the victim's bills," places it in a handkerchief, and "knot[s]" the handkerchief "so as to conceal he bill" (*id.*). "While the victim holds the handkerchief, the swindler recites incantations over it. During these fraudulent incantations, the swindler expertly substitutes a different handkerchief for the original. When the substituted handkerchief is opened, it contains a bill of a higher denomination" (*id.*). Thereafter, the now drawn-in victim is "told that the occult forces are especially favorable . . . and is induced to place a large sum of money in the handkerchief" (*id.*). After doing so, the con artist again changes the handkerchief with a slight of hand, gives the handkerchief to the victim, and tells the victim to "open it only at a specified later time" (*id.*). Upon opening the handkerchief, the victim is left with "nothing but waste paper" (*id.* at 3).

prosecute the offense, as harassment crimes did not require an intent to defraud (*see* Staff

Notes of Temp St Commn on Rev of Penal Law and Crim Code, 1964 Proposed NY Penal

Law [Study Bill, 1964 Senate Intro 3918, Assembly Intro 5376] § 250.10 at 389-390; *see*

*also* 3d Interim Rep of Temp St Commn on Rev of Penal Law and Crime Code, 1964 Legis

Doc No. 14 at 26-27). There is no evidence to conclude, as the majority does, that the

Bartlett Commission withdrew its proposal to include fraudulent accosting under the

heading of harassment offenses because they viewed the general harassment intent

provision as coextensive with the definition of the word accost (*see* majority op at 5, citing

McKinney's Cons Laws of NY, Book 1, Statutes § 231). Rather, the Bartlett Commission

changed course after introduction of the 1964 Study Bill, explaining that several

stakeholders had requested harsher punishments for the offense, which would have been

impossible had it remained a harassment offense:

> "Th[e] offenses [of jostling and fraudulent accosting] are substantially carried over to the old [proposed study] bill from the existing Penal Law's 'disorderly conduct' statute, where they have been of great utility, in New York City at least, as the principal weapons against pickpockets and certain kinds of confidence [artists]. As 'disorderly conduct,' these offenses are punishable under the existing Penal Law by a term of imprisonment of up to six months; but, as 'harassment' in the old proposed bill—an offense graded a violation—the maximum prison term imposable is fifteen days. This is regarded as grossly inadequate by many judges, prosecutors and police officers familiar with the problems involved in apprehending, prosecuting and protecting society from the professional pickpocket and confidence [artist]" (4th Interim Rep of Temp St Commn on Rev of Penal Law and Crim Code, 1965 Legis Doc No. 25, Staff Notes at 40).

"Upon the premise that these are basically 'theft' offenses requiring fairly severe penalties," the Bartlett Commission moved the crime of fraudulent accosting into the article dealing with theft in the Penal Law and upgraded the crime to a class A misdemeanor (*id.*). The change between 1964 and 1965 was solely related to sentencing and has no bearing on the meaning of the word "accost" or on the scope of the actus reus.[8]

The majority makes a final attempt to save the accusatory instrument by adopting an analysis different from the Appellate Term, concluding "not only did the complaint establish that defendant spoke first to the pedestrians by calling out to them, but also that defendant engaged in an affirmative act tantamount to a physical approach, by blocking the sidewalk and forcing passersby to maneuver around him to proceed" (majority op at 7). Because the majority holds open the question of whether someone accosts under Penal Law § 165.30 (1) "solely by calling out to potential victims" (majority op at 7 n 3), the majority must mean that the factual allegation that defendant obstructed the passersby is essential to the sufficiency of the accusatory instrument. But defendant no more accosted the passersby than would a religious leader who stands on the corner requesting contributions to a place of worship or a local homeless shelter, the Salvation Army Officer who positions a bucket in front of a store and rings a bell asking for donations to help the needy, the peace activist

---

[8] Unlike the majority's reimagining of the purpose animating the Bartlett Commission's proposal, the majority's citation to the contemporary Practice Commentary (*see* majority op at 6) is not inconsistent with the legislative history. Many confidence games begin as "ostensibly innocent" interactions (Richard G. Denzer & Peter McQuillan, Practice Commentary to Penal Law § 165.30, McKinney's Cons Laws of NY, Book 39, at 515)— for example, the pocket-book drop (*see* n 7, *infra*)—making it difficult to prove intent until the scam progresses. The intent provision has no bearing on the actus reus; the element of "accost" can be satisfied, notwithstanding a lack of mens rea (*see infra* at 20).

who stands in front of an entrance to Central Park who calls for an end to war and for civil disobedience, or the person who stands in the middle of the block holding a sign asking for food because they are hungry. In each case, the individual makes a general request of anyone who can hear or see them to act on their conscience. The fact that a pedestrian must make a minor adjustment to their preferred street path does not turn the speech into an accosting or mean that they have accosted everyone who chose to avoid them by changing direction. Walking around people is part of daily coexistence in public spheres and we would be hard pressed to find a passerby who would think themselves accosted every time they had to walk around someone talking in the middle of the street or on the corner. People often have to bob and weave, duck and dive, maneuver and negotiate to make their way around others standing, walking, or sitting in their way. There is no unbroken line of passage on a New York City sidewalk, and certainly not one as busy as that found in the Theater District, or the exact street corner where defendant was observed—48th and Broadway—where, at the time of defendant's arrest, large numbers of people were likely stepping on or off the curb shortly before curtains rose on the evening's performances.[9] The fact that defendant set up an immediate and convenient depository for anyone inspired to donate, while also allowing for pedestrians to avoid him completely by walking around

---

[9] For example, in the week ending February 21, 2016, Fiddler on the Roof grossed $977,197.82 in ticket sales at the Broadway Theatre, just up the street from where defendant was arrested (*see* Playbill, *Broadway Grosses*, https://playbill.com/production/gross?production=00000150-aea8-d936-a7fd-eefc72e8000b [last accessed May 4, 2022]); *but cf.* Movieclips, *Fiddler on the Roof (4/10) Movie CLIP - If I Were a Rich Man (1971) HD*, https://www.youtube.com/watch?v=D1TC1n9lhXU [last accessed May 4, 2022]).

a makeshift table, does not constitute accosting (*cf. People v Argyris*, 24 NY3d 1138, 1179 [2014, Rivera, J., concurring in part] ["No quotidian moment escapes potential police intrusion"]).

The legislative history and case law support just this view. In addition to upgrading the severity of fraudulent accosting from a violation to a misdemeanor, the 1965 amendment removed "stationing" from the same list that included accosting (*see* Penal Law former § 722 [6]; *People v Yonko*, 115 NYS2d 560, 564-566 [NY City Magistrates' Ct 1952]).[10] Dictionaries from this period defined stationing as "to assign to or set in a station or position," and "station" as "1: the place or position in which something or someone stands or is assigned to stand or remain"; and "2: the act or manner of standing" (Webster's Third New International Dictionary, Unabridged 2229 [Merriam-Webster 1966]). As this history suggests, merely standing in the way of a passerby is not, as the majority concludes, "tantamount to a physical approach" (majority op at 7). Rather, it constitutes stationing—a separate actus reus from accosting. Lower courts have similarly required more than this type of passive behavior to establish that a defendant accosts within the meaning of Penal Law § 165.30 (1). For example, in *People v Tanner*, the court cited a 1984 dictionary definition for accost—"to approach and speak to often in a challenging or aggressive way"—in support of its holding that the accusatory instrument did not

---

[10] The majority is correct that the legislature's removal of the actus reus of "stationing" indicates an intent to limit the scope of the statute to accosting, and that stationing is not synonymous with accosting (*see* majority op at 6-7). As discussed, that history supports defining "accost" more narrowly, not so broadly as to encompass the actus reus of "stationing," as the majority does.

sufficiently allege that defendant accosted within the meaning of the statute simply by displaying counterfeit sweatshirts for sale at a table where he was seated (153 Misc 2d 742, 745-746 [Crim Ct, NY County 1992]).[11] As the court explained, "the complaint fail[ed] to indicate that [the] defendant approached anyone, called out to potential customers or made any effort to initiate contact with any passersby. Though defendant may have hoped that people would walk over to the table where he was seated, this essentially passive behavior is not accosting" (*id.* at 745). Similarly, here, the accusatory instrument does not state that defendant made an approach to any person on the street, that he called out to a potential victim, or that he initiated contact with any passerby. The only differences between the facts of *Tanner* and this case are that defendant Mitchell did not set up a table to display goods for sale and that, rather than relying solely on signage, he verbally invited the general public to act charitably and "Help the Homeless." The *Tanner* dicta only encompasses calling out to a potential customer, which in the context of the court's clear statement that "an essential element of [fraudulent accosting] is that the defendant initiate contact with the potential victim in some manner" (153 Misc 2d at 745) suggests the court was of the view that accosting required more than an untargeted verbalization of defendant's signage. Put another way, defendant Mitchell's plea to the general public is the same as defendant Tanner's signage, and without a factual allegation of some aggressive act to insinuate

---

[11] *Tanner* relied in part on the criminal jury instruction, which at the time of the decision in 1992 defined "accost" as "to approach and speak to another person without first being spoken to" (153 Misc 2d at 745 [internal quotation marks omitted]). The current criminal jury instruction has removed any definition of accost (*see* CJI2d[NY] Penal Law § 165.30 [1]), reflecting the obviousness of the meaning of accost to contemporary juries.

himself into the physical space of a passerby or a specific invitation to a targeted individual, the accusatory instrument against defendant Mitchell—like the complaint in *Tanner*—is defective.

The cases relied on by the majority are factually distinct from the instant appeal, each involving direct contact with a victim. In *People v Bannister* (37 Misc 3d 1229 [A], 2012 NY Slip Op 52240[U] [Crim Ct, NY County 2012]), a charge of fraudulent accosting was dismissed where the defendant hailed cabs in the hopes of obtaining tips from travelers while pretending to be an Amtrak worker, but where the accusatory instruments did not allege that defendant approached the victims while doing so (*see also People v Morrison* (58 Misc 3d 19 [App Term, 1st Dept 2017] [holding same where defendant was impersonating a Port Authority employee]). *People v Mellish* involved a defendant who stood behind a table with signs stating "Animal Rights Lobby" and "Homeless Cats" and asked pedestrians to sign a petition and talked two people into giving money to what they had been misled to believe were genuine charities (4 Misc 3d 1013[A], 2004 NY Slip Op 50869[U], *4 [Crim Ct, NY County 2004]).[12]

The majority's description of the legislative history and reliance on decisions in the lower cases do not support the conclusion that the legislature intended "accost" to include

---

[12] The lower courts have routinely found the element of accosting satisfied in circumstances much narrower than the majority's approach. For example, *People v Lewis* involved a fake ticket sale in which the accusatory instrument alleged that the defendant offered to sell someone a ticket, received money and the victim's own ticket in exchange for the defendant's ticket, and that the deponent officer recovered four additional forged tickets from the defendant's hands (*see* 56 Misc 3d 126[A], 2017 NY Slip Op 50800[U], *1 [App Term, 1st Dept 2017], *lv denied* 30 NY3d 951 [2017]).

statements to the general public on a street corner, without any aggressive act aimed at a potential victim, simply because passersby had to walk around defendant.

## IV.

The majority's decision here is troubling because it expands the definition of accost to include speech and conduct that the legislature did not intend to criminalize. Indeed, a prior version of the statute was struck down as unconstitutionally vague in 1969 because it lacked a mens rea element and did not sufficiently define the prohibited statements and conduct (*see* William C. Donnino, Practice Commentary, McKinney's Cons Laws of NY, Penal Law § 160.30; *People v Harris*, 64 Misc 2d 510 [App Term, 1st Dept 1969]).[13] The legislature amended the statute in 1971, the version that exists today, to address those deficiencies (*see* Bill Jacket, Letter from City of NY, Off of Mayor, L 1971, ch 772 at 5). The majority's construction of the statute to include standing on the street and making statements to the general public as an "accost" of some unknown person who has no contact at all with defendant sweeps too broadly and risks another constitutional challenge to the statute.[14] It is no answer that the mens rea element protects against unlawful prosecution

---

[13] The previous statute provided: "A person is guilty of fraudulent accosting when [that person] accosts [another] person in a public place and, either at that time and place or subsequently in any place, [the person] makes statements to such [other] person of a sort commonly made or used in the perpetration of a known type of confidence game" (Penal Law former § 165.30).

[14] This appeal hardly justifies the need for broad definitions to address street swindles, especially when other charges are more appropriate to the conduct as observed by the officer. Defendant told the officer that he was homeless and that he was affiliated with the organization referred to at the table. The officer did not contradict those statements. If defendant was lying about either or both points, but telling the truth that he would keep

of those not involved in illegal activity; the actus reus element must be assessed and satisfied on its own (*see* Penal Law § 15.10; *cf. e.g. People v Gaworecki*, 37 NY3d 225, 234 [2021] [declining to address causation element of offense where Court "concluded that the evidence presented to the grand jury was legally insufficient to establish the requisite mens rea for second-degree manslaughter or the lesser included offense of criminally negligent homicide"]). Put another way, for purposes of determining whether the accusatory instrument adequately alleged that a defendant accosted a target of a swindle, the factual allegations must describe the defendant's contact with the intended victim. Here, as recognized by the arraignment court, there are no allegations that defendant approached anyone. The majority ignores this simple fact and collapses the actus reus and mens rea elements when it refers to defendant's alleged admission rather than the officer's actual observations (*see* majority op at 9).[15]

---

most of the donations if he successfully swindled victims into giving him money, he could have been arrested for an offense such as attempted petit larceny by false promise (*see* Penal Law §§ 110.00, 155.05 [1], [2] [d], 155.25). If he was telling the truth, it is hard to see how defendant is the confidence artist targeted by the legislature. Rather, it seems he is a person in a desperate position seeking assistance from his fellow New Yorkers.

[15] The majority fails to explain the source of the alleged admission but it cannot be defendant's plea, as any statement to the court would be irrelevant to our analysis because defendant could not cure the inadequacy of the accusatory instrument's factual allegations. And, of course, the accusatory instrument does not allege that defendant confessed to making false statements.

Unfortunately, homelessness is now a familiar, perennial part of our society, one we have yet to properly address.[16] The majority's decision does nothing to resolve that problem, instead making it easier to penalize people who are attempting to survive. Recognition that the majority's approach will expand the criminalization of homelessness does not "undermine . . . the laudable goals" of organizations that advocate for homeless

---

[16] In 2016, the Coalition for the Homeless—the court-appointed monitor pursuant to the consent decree in *Callahan v Carey* (Sup Ct, NY County, Aug. 26, 1981, Andrew Tyler, J., index No. 42582/79, available at https://dev-cfh.pantheonsite.io/wp-content/uploads/2014/08/CallahanConsentDecree.pdf; *see also Eldredge v Koch*, 98 AD2dd 675 [1st Dept 1983])—reported that "the shelter census remain[ed] at near record levels, with 60,400 individuals in shelter each night, including nearly 24,000 children" and approximately 14,700 family households (Coalition for the Homeless, State of the Homeless 2016, Beyond the Rhetoric: What Will Turn the Tide? at 2, 11 [Apr. 2016], available at https://www.coalitionforthehomeless.org/wp-content/uploads/2016/04/SOTH-2016.pdf). Additionally, New York City surveyed 2,794 homeless people on the streets during their annual nightly count in February 2016 (*see* Press Release, City of New York, Office of the Mayor, 2016 Federally-Mandated Hope Count Finds 12 Percent Decline in Street Homeless on the Night of the Count [Apr. 28, 2016], available at https://www1.nyc.gov/office-of-the-mayor/news/408-16/2016-federally-mandated-hope-count-finds-12-percent-decline-street-homeless-the-night-the).

The Coalition for the Homeless estimated that, on each night in December 2021, an average 18,704 homeless single adults and 10,221 homeless families slept in a New York City Department of Homeless Services (DHS) shelter, with Black and Hispanic populations disproportionately represented (*see* Coalition for the Homeless, State of the Homeless 2022: New York at a Crossroads, at 20-21 [Mar. 2022], available at https://www.coalitionforthehomeless.org/wp-content/uploads/2022/03/StateofThe-Homeless2022.pdf). The City counted 2,376 homeless people sleeping on the streets in January 2021 (*see* David Brand, *NYC Touts Drop in Street Homelessness, But Advocates Say Count Obscures Extent of Crisis*, City Limits [May 20, 2021], https://citylimits.org/2021/05/20/nyc-touts-drop-in-street-homelessness-but-advocates-say-count-obscures-extent-of-crisis/).

The Coalition for the Homeless has also noted that the "annual point-in-time estimate of unsheltered New Yorkers . . . is a vast undercount, and no accurate census of this population has ever been achieved" (State of the Homeless 2022 at 10).

people (majority op at 9). We are not free to ignore the impacts of our decisions on our communities because "[c]ourts . . . do not sit or act in a social vacuum" (*Cleburne v Cleburne Living Center, Inc.*, 473 US 432, 467 [1985, Marshall, J., concurring in judgment in part and dissenting in part]).

I dissent.


Order affirmed. Opinion by Judge Garcia. Chief Judge DiFiore and Judges Cannataro and Troutman concur. Judge Rivera dissents in an opinion, in which Judge Wilson concurs. Judge Singas took no part.

Decided May 24, 2022